Court will proceed to the fifth case, Reed v. Ray Clooney. Excuse me, Reed and, uh, Ray Clooney v. Palmer. May it please the court. My name is Matthew Cease, and I'm here on behalf of both appellants, uh, Paige Ray Clooney and Lera Reed. Um, today we ask that this court reverse the district court and find that qualified immunity does not apply to Charles Palmer. The district court and Palmer's analysis, um, fails in one major regard. And that is whether Palmer's only action in this case was signing the contract with Wisconsin, which placed Ray, uh, Reed and Ray Clooney in Wisconsin in the first place. And that's not the end of what Palmer's involvement was in this case. Palmer, um, I think it's important we take a step back and look at how Palmer's involvement began in this case. And that was by way of a juvenile court order that placed Reed and Ray Clooney into the custody, care, and control of the director of the Iowa Department of Human Services, who was Charles Palmer. And then... Now, DHS had contracted with the Wisconsin Department of Corrections, uh, to house the plaintiffs and, of course, other juveniles. But I take it that as a matter of Iowa law, the plaintiffs were still in Iowa DHS's custody. Is that right? That's absolutely correct, Judge. Um, if you look at the juvenile, well, I don't want to look at the juvenile court orders, but they were submitted into the record. Um, but I, so I don't think we can look at those as part of these, uh, motion to dismiss standard where we're at. But, uh, as pled, these two girls were placed into the custody of, um, the director of the Department of Human Services by court order. And, and within that, the, and I think it's important to take a step back also and look that the reason that Director Palmer had to put these individuals in Wisconsin is because the Iowa State Training School in Toledo, Iowa, the Iowa Juvenile Home, had been closed for the exact same type of allegations that we have that are part of this lawsuit. And, and at no point, I think it's important to note, is that in these, um, proceedings, was it ever alleged that Ray, Clooney, and Reed were ever placed into the care, custody, and control of the state of Wisconsin, uh, or the equivalent of Palmer in the state of Wisconsin. Instead, he was, uh, these girls were always in the care and custody control of, of Palmer and the state of Iowa. And... Now, do you know what sorts of information was included in the reports that Mr. Palmer's departments received regarding the plaintiff's placement? And, and, and Judge Robner, I think that's kind of part of the problem with this factual record and the problem with granting qualified immunity at the motion to dismiss date. We have such a limited record to begin with. And, and that's why you see this circuit and other circuits talk about the problems with doing a motion to dismiss qualified immunity analysis is because we don't have that full factual record. But I think if you look at the pleadings, um, it's mentioned that Palmer would regularly receive reports. And then if you look at the pleadings as well, it's alleged on behalf of both of these individuals that the progress reports talked about the number of days of isolation that was happening for each one of these individuals. And that's... You got to the point where Palmer's in charge and there's no place in Iowa to put them. That's correct. How long did it take to get the arrangement made with, uh, Wisconsin? I don't know the answer to that, Judge. And I don't know if that's in the, the actual pleadings. All that we know is that prior to their, them being placed, both of these individuals being placed in, um, the custody of, of, uh, Palmer and then subsequently into the Wisconsin Copper Lake facility, um, that they had entered into a contract. They being Palmer and the state of Iowa had entered into a contract with, um, the state of Wisconsin. So this contract had nothing to do initially with Reed and... I don't believe that that's the case. I don't think it was an individualized contract. Well, I mean, because it's, it was the demand of having a facility. That's, that's exactly right, Judge. Because that's what I'm looking at. It wasn't, it wasn't Reed and Clooney or whatever that, that caused them to get this arrangement with Wisconsin. That came up beforehand. That's, that's exactly right. That's why I wonder, well, how long did it take for Palmer to get the girls over to Wisconsin? Or was that where they were initially designated to go? That's, I, I believe that the courts, and, and you have to, to look again at the records. These, um, individuals were coming from different parts of the state of Iowa. Um, they ended up that we've represented both of them for, for what happened. But, um, when the state of Iowa closed the state training school, they needed a state training school to, to place these, these problem youths. And, and the contract was entered into to send them to Coffey Lake. So the contract was already entered into when these two girls showed up. I, I believe that that's the case. If it's not in the records, I can, I, in, in the petition, I can assert that it is. Um, because the, um, we have Reed who is up in Northwest Iowa. Um, and she's ordered to be the, the department, to the custody and care of the department. But then, um, Ray Clooney, I believe was in, in, uh, Lynn County, Iowa, which is in Central Iowa. And these judges would have no way to, to talk to each other to know. So this contract was already in place at the time of the referral, um, to, to Wisconsin. And, and I, in fact, I believe that they were just referred to a state training school. And because Iowa didn't have a state training school, that's where they had to go. And I think... And is it, is it your position that Mr. Palmer could have terminated the contract with Wisconsin at any time with or without the juvenile court's approval? I, I don't know if we can get into that deep of analysis without having the contract as part of the, the record, Judge. Um, they were ordered to be in the custody and care of the, um, the state. And so I think the way that I would look at this is that Palmer is in no different position than he would have been if he was the, a warden of a prison or the department, or the head of the Department of Corrections in a state. And in fact, this is exactly what the position he was in, um, the state of Iowa in the Turner case where they found that qualified immunity did not apply to him in that now closed state training facility. And, and so in those types of proceedings, I believe Iowa law allows the, um, the Department of Human Services to take whatever actions are necessary to protect the youths. And so I, I think it's somewhat of a red herring to say that, oh, we would have to get an approval before we could remove these, um, individuals from a potentially hazardous or damaging, um, facility. I don't think that that's the case at all. And, and I don't think that it would be necessary for a, certainly a juvenile court's not going to look at them and say, well, we're going to have to get an order and take the next number of days to get a hearing and all of that stuff. If we know that there is, is harm that's happening to these individuals, then, um, it's in the best interest of the children to, to be removed from that hazardous situation. What I'm trying to ascertain is what Palmer is, is the defendant. And if it's practically automatic, I know maybe these girls weren't brought in at the same time. They may have, you know, they're from different places. They've done different things that caused them to have to be taken as tanks. Whatever it was, this transfer was fairly automatic. Well, it was, it was automatic in the sense that they were ordered to a state training school. Iowa did not have a state training school. So then the option goes to there. That's, well, it had to go somewhere. Yeah, exactly. And so that's maybe on different days, but at least they both went to the same place. Yeah, that's, that's exactly right. And now Palmer is getting reports of some kind. While, while they're at the facility. And the complaints, which is long, as far as I understand, it's about 30 pages long. Yes. Only a fraction of it's going to Palmer. Is, there's a lot of gripes over in Wisconsin. And I don't know what. And now the girls are, what, 18, 19? I believe now they are, yes. Yeah, so they're plaintiffs. And that's not the parents. They're not the parties. That's correct. And so I'm just trying to, I just want to hear what, why Palmer has to stay in this case. Because Palmer was the individual that these children were at the time that, that these events were happening. He was the custodian of these individuals. Even though he didn't have custody. He didn't have physical custody. But they were ordered to the custody. It's very much similar to a prisoner's order to the custody of the Department of Corrections or a warden of a prison. I'll reserve the rest of my time for rebuttal. Thank you. Thank you, Stacey. Ms. Kramer. May it please the court and counsel, I'm Gretchen Kramer on behalf of Charles Palmer. And I would take issue with a number of things that were represented here today. The petition. Could you just start with one? Do you agree that regardless of where the plaintiffs were housed, they were formally, formally, because they were also formerly, they were formally within the Iowa DHS's custody at all times? No. Iowa Code Statute 232.52 sub E orders students to the guardianship with custody with the district court. The actual district court orders, which is cited in the appendix in the complaints, indicate that the juvenile courts ordered each child to be placed at Copper Lake. Copper Lake is mentioned with specificity in each juvenile court order. And the complaint directs that the juvenile court order ordered that these students be placed at Copper Lake. They were not in the custody of the Department of Human Services. Could Mr. Palmer in any way replace them in another facility? It takes an order of the juvenile court and plaintiffs. He could have requested that. Could he not have? He was not a party to the juvenile court action. It would have required him to move to intervene in order to do so. The district court indicated that there's nothing in the complaint that alleges that he had that authority or that it would have been appropriate or that it would have been well received by the court. The complaint does allege that Palmer received reports. We have to take the complaint on face value for a motion to dismiss, but it is not appropriate. Let me tell you what my problem is with this, with your view. If Palmer could be liable had the girls been placed at an Iowa facility, if there was one, then I'm not sure why he couldn't be liable simply because he instead contracted with the Wisconsin DOC Department to take them. The complaint's allegation is that the girls were under Iowa DHS custody either way, and he allegedly was monitoring their placements at Copper Lake. So I would disagree that Palmer can be held liable just on his basis of being the head of the Department of Human Services. To be liable under 1983, it takes personal responsibility for the contact alleged, and that is something that the district court took issue with as well, that there were no allegations of things that he personally did to these students. Most of the allegations are things that happened to them while they were at Copper Lake, and there are not even any allegations that Palmer had direction and control over the conditions of confinement within the Copper Lake facility. Well, given that he, Mr. Palmer, signed the contracts with the Wisconsin Department of Corrections, did he not at the very least have the power to terminate the contract to place juveniles at Copper Lake upon notice that the practices or conditions there were unconstitutional? In other words, in that sense, surely he had the authority to stop the alleged violations of the plaintiff's rights, didn't he? No. If he had terminated the contract, it would have terminated the payment. It would not have changed the placement of the students. So Iowa would no longer be paying Wisconsin, but it would have still required an action of the juvenile court to change the placement of the students. And where will I find that, that it would take, because I sure didn't see it, that it would take an action of the juvenile court? Plaintiffs conceded it in their brief before the district court, and the district court relied on it in the order, but it is not in the face of the complaint. Would Mr. Palmer have had any responsibility had he received reports of possible unconstitutional confinement to go to the juvenile court? There's really nothing in the structure of Iowa law that would have required him to do that. The juvenile court officers oversee the placement. They meet with the students. They make recommendations to the placement to the juvenile court. DHS is not involved. They are not, juvenile court officers are not DHS employees. Really, the fact that DHS does the payment is an infrastructure issue. It's an artifact of the fact that DHS pays a lot of bills. We have the Medicaid program. So it has the infrastructure to regularly provide the payment. What does DHS, Department of what? Human Services. Who is under that jurisdiction besides juveniles? So the juveniles who are delinquent here are not under the jurisdiction of the Department of Human Services unless they are placed in a DHS facility. They are under the jurisdiction of the juvenile court, and there are cases overseen by a juvenile court officer who reports through the court system. They're not a DHS employee. Well, you're basically saying, this is what concerns me, Palmer had nothing to do with their being assigned to, what's the name of the place? Copper Lake. Copper Lake, yeah. Correct. Is that correct? It is correct. And then if that's correct, then I'm really trying to explore what Palmer should have done. And there's another very strong curiosity here. These girls were both 16 when they went over there. Where are their parents? They still have parents. They had an attorney appointed to them that represented their interests in the juvenile court. The parents are involved in this litigation? I don't believe the parents are involved in this litigation. Not this one. I mean, just as far as the kids. The parents, I hope, were well aware of where their kids were and had some concern and visitation and a lot of other things. I'm just guessing here, but that concerns me. And I'm speaking outside the record here, but I do think it's an unfortunate fact that a lot of the students who end up in the juvenile justice system maybe don't have really strong parent involvement. Okay, that's one answer. Okay. Let me ask you this. Wherever the plaintiffs were, in state or out of state, were they not within the custody of the Iowa Department? They were not. They were within the custody of the Iowa Juvenile Court. So what does the department have to do with any of this, in your view? Well, that's the issue. That's why we're here, Your Honor. Well, what's your view? I mean... Well, I can tell you that Charles Palmer was... If the view is that they're no longer in the custody of the department, my God, the department could send them to Mars. I don't know where the department could send them. No, the juvenile court would have to place the students. And I provided the court with the citation to the Iowa Code that requires that. The juvenile court assigns where these students will live. How are you saying that that should have been sued, the juvenile court? If the issue is about their placement, the juvenile court was responsible. I can tell you that Charles Palmer was very offended by being sued over something that wasn't his decision. Well, who receives the report, Ms. Greenberg? The juvenile court officers. Do we know whether it ever goes to any official in the Department of Human Services? No, the Department of Human Services did not get the reports. The reports went to the juvenile court officers, and they went to the juvenile court. So, no official then, following up on Judge Romer's inquiry, no official within the department ever monitors in any way the placement of any of these juveniles in a Wisconsin facility? No, that's done by the juvenile court officers and the juvenile court. Well, it looks like Palmer allegedly received regular reports regarding the Iowa juveniles. Are you saying, you know, if you two can't even decide on this, how can this be decided on summary judgment? So, that's the allegation in the complaint, and I have to accept that for the purpose of the motion to dismiss. I'm telling you, it's not correct. But it doesn't say what those reports included, and it doesn't say, the complaint doesn't say what Director Palmer was required to do with that information. And that was found in the dismissal. I think that's part of the problem of a dismissal 12B6 level. I mean, it may well be that the director in a more flushed-out proceeding would not be liable. But we don't, you know, that's why at summary judgment you might well be successful, right, if we had a little more information. But I think the kind of questions that we're asking, we're just off of the pleadings, and, you know, we have to take the pleadings. And it just seems that it's a pretty early stage to make this determination that could very well go your way at a later date. The other issue that we argued before the district court was lack of jurisdiction over the state of Iowa. Yeah. And the district court decided on the merits first. Right. But should this court choose to disagree on the merits, we would reallege the issues with jurisdiction. I see my time has expired. All right. Thank you. Thank you. Excuse me. Judge Wolbert, did you have another question? No, no. All right. Thank you, then. May I brief the court? As Ms. Kramer stated, we do have a fundamental difference in who has custody and control of these individuals. But I think it's important to go back to what you stated earlier, Judge Robner, in that this, if they were in Iowa custody, Palmer would be on the hook for this. And he has been on the hook for the exact same things in the Iowa equivalent of those straight. Now, you say that, but that's what do you say to Ms. Kramer's suggestion that it's in the hands of the court? The court did direct. And, again, I have to be careful because of what we're at in the pleadings. But in their motion, we've alleged it. And I think that that's proper. I understand. But in her motion to dismiss that she filed in this case, she attached the court orders that directed these individuals. So it's part of the record, but it was not considered, nor do I think it can be considered for this plea. But the way I read that is that these individuals are placed into the custody of the director of the Department of Human Services. And then the court orders her to a state training school. And in this case, they had to. And it says, or other institution. And then it says, period. Specifically, I direct them to, based on the contract that is entered between the state and Wisconsin, to Copper Lake, is the way that the court order actually reads. But, again, that's not part of the record, and I don't think we can consider it for this. Yeah, it's not. And, yeah, my concern, I'm not sure that if you're successful here that you're going to be able to establish that this is a situation that isn't clearly established in the law. I understand that there could be hurdles at the time of summary judgment, but it needs to happen at the time of summary judgment. We obviously don't know the full extent of all the reports. That's why we need discovery to go into that to see exactly who got what, when they got it. And that's part of the problem with granting a motion to dismiss at this early stage. So, thank you. We ask that you reverse. All right. Thank you, Mr. Ceci. Thank you, Ms. Kramer. The case is taken under advisement, and the court will proceed.